IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 2, 2024 Session

## HEATHER MARIE BAILEY v. DANIEL MICHAEL BAILEY

**Appeal from the General Sessions Court for Warren County**
**No. 21-DV-9505     L. Craig Johnson, Judge[1]**
_____

**No. M2022-01467-COA-R3-CV**
_____

Father and Mother divorced.  In ruling upon various matters contested by the parties, the trial court evenly divided Father's pension without determining whether a portion was separate property, awarded Mother rehabilitative alimony, and named Mother as the primary residential parent.  Father appeals, asserting error as to all three determinations. We conclude that the trial court erred in failing to treat the pre-marriage portion of the pension as separate property.  As for the trial court's alimony award and primary residential parent decision, the trial court's findings of fact and conclusions of law are insufficient under Tennessee Rule of Civil Procedure 52.01.  Accordingly, we vacate the portions of the trial court's order regarding the classification and division of assets, alimony, and primary residential status and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Reversed in Part; Vacated in Part; Case Remanded.**

JEFFREY USMAN, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Benjamin Lewis, Murfreesboro, Tennessee, for the appellant, Daniel Michael Bailey.

André S. Greppin and Daniel H. Rader IV, Cookeville, Tennessee, for the appellee, Heather Marie Bailey.

---

[1] Judge Johnson resigned from his role as a Judge in the 14th Judicial District effective May 1, 2021, and sat for this case by special designation.

# OPINION

## I.

After approximately ten years of marriage, Daniel Bailey (Father) and Heather Bailey (Mother) filed cross-complaints for divorce in the General Sessions Court of Warren County. In addition to awarding a divorce, the trial court also ruled regarding, among other things, the division of assets, spousal support, and parenting time as to their two shared children. Father appeals, asserting the trial court made substantive and procedural errors in reaching its determinations related to division of his pension, the alimony award, and primary residential parent status. Mother contends the trial court erred as to the award of alimony in the present case, though she diverges from her husband in her understanding of the nature of the trial court's error as to this matter. She also seeks her attorney's fees on appeal.

Turning to the underlying circumstances of this case, before the parties married, Father became a professional engineer and worked for the Murfreesboro Electrical Department. Father started toward a pension and opened a 401(k) retirement account, contributing to that account for three years before marrying Mother. During this time, Mother was a teacher in Rutherford County while parenting two children from a prior marriage (the Stepchildren), whom Father helped to raise throughout their marriage.

When Mother gave birth to the couple's first shared child in 2014, her employment became "a huge point of contention" in the marriage. Eventually, Mother stopped teaching and allowed her teaching license to expire. The parties disagree about how these events came to pass. According to Mother, Father, whom she characterized as extremely controlling and possessive, demanded that she stop working and "begged [her] to let [her] teaching license expire." At trial, Mother recounted a conversation where Father told her, "You don't need to go back to the workforce. If [the Stepchildren] were good enough for me to stay home with them, mine are as well." Father denies making any such statements. He testified that it was instead one of Mother's colleagues who came up with the original idea for Mother to consider leaving the workforce after the birth of the couple's first shared child. He explained at trial that he felt "very neutral" about the decision at the time, "explained to her the pros and cons . . . what it was going to do to the family, what we'll have to budget, and what we'll have to do," but also recognized that it was Mother's decision. Father also rejects the contention that he urged Mother to allow her teaching license to expire, asserting instead that he had asked Mother to return to work following the birth of the couple's second child in 2015 and that it was Mother who refused and allowed her teaching license to expire.

In the wake of the parties becoming increasingly concerned about the Stepchildren's interactions with Mother's ex-husband in 2018, Father left his job at the Murfreesboro Electrical Department and moved the family to Warren County, Tennessee. Mother

2

continued to focus on being a homemaker. Father sought and obtained a job with Irby Utilities at an initial salary of $65,000 to $75,000 per year, but the parties quickly realized the salary was insufficient to meet their needs.

One major contributor to the couple's financial challenges was the discovery of a mold infestation in their new home, rendering it arguably uninhabitable. The family quickly moved out of what they called the "Mold House" and into a permanent residence on Todd Road in McMinnville, Tennessee. Although the parties received a settlement in litigation related to the Mold House, Father realized that he would need to make more money to manage two home payments while providing for a family of six. Accordingly, he began working overtime around the middle of 2019 and later took on a second job with the same company. Based on his W-2s, which were admitted at trial without objection as evidence of his income, Father earned $120,042 in 2019, $170,312 in 2020, and $169,332 in 2021.

In December 2020, the parties separated. Father testified that the separation began chaotically. Father indicated that he came home to discover that Mother had taken the children and left the family home without warning. Father responded by removing over $50,000 from the parties' joint bank account. As a result of this withdrawal, Mother was left with access to approximately $1,000. Father moved into another residence in McMinnville several days later and has lived at that residence throughout the pendency of this case.

Mother filed for divorce in January 2021. In her complaint, Mother alleged that Father engaged in inappropriate marital conduct, but she did not provide any specific details. She also alleged that Father "displaced . . . certain marital assets including a $54,817.89 withdrawal" from the parties' joint bank account, and "convinced her to let her teaching license expire." Mother attached a copy of a proposed temporary parenting plan to her complaint. Under that plan, Mother held primary residential parent status, and Father was provided with custody of the children "every other Thursday from 3 p.m. until Monday at 3 p.m." Father acceded to this temporary plan on the condition that it not set any precedential value in fashioning the final parenting plan. The trial court ratified the plan in March 2021.[2]

---

[2] There is conflicting information in the record concerning Father's ability to interact with the rest of his family between January and April 2021. On direct examination, Father testified that Mother filed for an order of protection shortly after leaving the family home but also stated that Mother voluntarily withdrew that request by the end of January 2021. He maintains, however, that Mother prevented him from seeing the children until April 2021, which was months after Mother submitted what purported to be an agreed temporary parenting plan to the trial court as part of her divorce complaint. Furthermore, the trial court ratified the parties' temporary parenting plan on March 17, 2021, which was at least several weeks before Father claimed Mother allowed him to see the children again.

As part of the divorce proceedings, both spouses submitted a statement of their finances to the trial court. According to her January 2021 statement, Mother's only source of income was a monthly $904 child support contribution from her ex-husband. Mother estimated that her total monthly expenses amounted to $3,241.90, specifying that over $1,500 of that amount was dedicated to rent and utility payments. Father's February 2021 income statement reflects that his "net income per week is $2,104.56." After identifying his bank accounts and debts, Father estimated that his total monthly expenses would usually be between $7,036.06 and $7,378. Father also asserted that Mother had "the ability and the education to obtain employment given her bachelor's degree, teaching certification and previous teaching experience. Therefore, income should be imputed at $2,933.00/per month due to her willful/voluntary underemployment."

In February 2022, Father filed a counter-complaint for divorce, asserting irreconcilable differences as well as inappropriate marital conduct. Father did not describe the nature of what he believed to be Mother's inappropriate marital conduct in his counter-complaint. Regarding the couple's two shared children, Father sought a new permanent parenting plan and specifically requested that he be named primary residential parent.

The trial court held a two-day hearing on the parties' cross-complaints for divorce in July 2022. Each side marshaled at least six witnesses to support their cause. The witnesses painted starkly different pictures of each spouse's conduct during the marriage and the separation. Each spouse lobbed accusations at the other.

Despite the intensity and dramatic variance of the conflicting testimony presented at trial, it appears both parties agree on several facts. Neither spouse suggested that the other failed to follow the general terms of the agreed parenting plan, though Father suggested that Mother sometimes went about her obligations in a lackluster and absentminded fashion. Both parties acknowledge that each spouse played some role in the children's scholastic and extracurricular activities, even if their accounts of their involvement levels differed. Concerning schooling, both parties represented that they helped the children complete assignments and ensured their attendance at school. Father disagreed with Mother about her diligence in this respect. Based on several homework sheets that he submitted into evidence without objection, Father asserted that Mother would not push the children to always complete their assignments. He alleged that, on at least one occasion, Mother completely neglected the children's homework obligations, leaving that responsibility to one of the Stepchildren, who signed the homework sheets. Father also alleged that Mother failed to properly register the children to attend school during the 2021-2022 school year, and that her failure to do so necessitated his intervention to complete that process on his own. In terms of extracurricular activities, both parties agree that the children enjoyed Cub Scouts and Girl Scouts respectively, and both parents asserted that they were involved in those activities to some extent. Father did challenge Mother as to the extent of her involvement. Father asserts that he was completely in charge of scouting activities and that Mother made little to no effort to participate. Mother,

however, testified that she believed Father, who himself had been a Boy Scout, wanted these activities to be ones that were mainly within his domain, but that, nevertheless, she participated on various occasions. The trial court heard testimony from three scouting-related witnesses who generally agreed that Father was more involved in these scouting activities than Mother, but each also noted that they had observed Mother present during at least one scouting meeting.

Testimony was presented in connection with Mother's interactions with two men post-separation.[3] The testimony regarding the first, B.M., generated significant friction at trial. Mother testified that B.M. sexually assaulted her in May 2021 and that she had never intended to have any romantic relationship with him. B.M. testified that Mother encouraged a romantic relationship and that their sexual encounter in May 2021 was entirely consensual.

Father also presented evidence in relation to Mother's relationship with Geer Gipson. Mother agreed that she had developed a romantic relationship with Mr. Gipson, although it is unclear exactly when that relationship changed from a friendship into a romantic relationship. Mr. Gipson testified that he first met Mother in November 2021 at an invite-only musician's writing event, but that their relationship only became romantic several months before trial.

Each spouse also spent time at trial accusing the other of conduct that might negatively reflect on their fitness to serve as primary residential parent. According to Father, Mother "drank every day." He asserted that "[i]f there was a bottle of rum, it was going to be emptied that night. There's a box of wine that stayed in the closet, and I think that box has somewhere [between] four or five bottles in that box." He also stated that Mother kept a bottle of eggnog in the closet as "a mixer for something else that she had in there before," and that sometimes he "would find her locked inside the bedroom, inside that closet, drinking the wine. Kids are downstairs, unattended." Father implied that this alleged alcohol consumption also affected Mother's mental health, noting that he found handwritten notes in the closet that Father suggested were indicative of depression. Mother denied that any heavy alcohol consumption took place. She testified that she drank an average of four drinks per week. She also explained that any handwritten notes Father may have found only reflected that Mother, as a songwriter, was engaged in the songwriting process.

Mother asserted that it was actually Father who had problematic drinking habits. She testified that Father would drink "[a] lot of scotch" every week. Mother stated that Father "sometimes" drank "a whole bottle in a night" and "drank . . . every night,

---

[3] Father also insinuated that Mother had inappropriate relationships with at least three other men, but the record does not clearly indicate when these relationships would have taken place. Mother denied ever having any romantic or sexual interactions with those men.

faithfully." While she acknowledged that Father would not "get drunk every night," she maintained that Father "got drunk pretty often." Father disagreed with this characterization, quipping, "I don't know how I would function."

Mother does not dispute that Father has paid for all living expenses for the family and that she did not work outside the home for almost the entirety of the separation period.[4] Father made payments for three separate residences: the "Mold House," Mother's residence on Todd Road, and Father's residence on Willow Way. Father submitted a detailed list of his expenditures throughout the divorce as an exhibit at trial, and it reflects that he has paid $45,000 in rent to support Mother between March 17, 2021, and the date of trial. Regarding non-residential payments, Father testified that he: (1) returned $10,000 of the money that he took from the parties' joint bank account which he characterized as a one-time alimony payment, (2) sent Mother $5,700 at one point in exchange for four extra days of visitation with the children, and (3) paid off $15,000 of Mother's student loans.

Father presented the only expert witness at the trial: Dr. David Pate. Dr. Pate counseled Father for some time, starting almost immediately after the parties' separation. According to Dr. Pate, Father does not have any abnormal anger issues that would make it dangerous or inappropriate for him to take on a more significant parenting role in the children's lives, and the grief and anxiety he experienced after Mother left the family home was to be expected. Dr. Pate opined that he believed Father is an excellent parent. Dr. Pate based some of his opinions concerning the best parenting arrangement for the children on a series of twelve counseling sessions he held with the children. While Dr. Pate invited Mother to these sessions, she declined those invitations. Without any objection from Mother, Dr. Pate recalled the following comments made by the children during his sessions and shared them with the trial court: (1) that they felt safer with Father and desired more parenting time with him; (2) that they felt unsafe under Mother's supervision, especially after some instances where Mother would leave the children under the Stepchildren's supervision to interact with Mr. Gipson; (3) that, during said instances, the Stepchildren would speak poorly of Father, not feed them healthy foods, and fail to provide them with clean clothing; and (4) that Mother's condition, generally speaking, had deteriorated since the parties' separation. Dr. Pate recommended that the trial court fashion a new permanent parenting plan, name Father primary residential parent, and award him eighty percent of total parenting time.

The remaining testimony focused on dueling witnesses supportive respectively of either Mother or Father and in opposition to the other. Mother's mother, one of the Stepchildren, one of Mother's friends, Mr. Gipson, and Mr. Gipson's mother all testified in support of Mother. They testified positively about her ability to parent the children and

_____

[4] Mother testified that she did take a brief part-time job as a painter in McMinnville. However, she conceded that she only worked for approximately six days total in that role. This appears to be the only work by Mother outside the home during the pendency of the divorce proceedings.

about various positive individual interactions that they witnessed between Mother and the children. One of the Stepchildren also spoke negatively about experiences he had with Father, including accusing Father of locking him out of the family home for hours without explanation.

Father attacked the credibility of several of these witnesses, including his stepson and Mr. Gipson. Father also reintroduced the issue of alcohol back into the trial while cross-examining Mr. Gipson, noting that his car had been equipped with an interlock device for some time. Mr. Gipson acknowledged that, following his own divorce years earlier, he had struggled with elevated alcohol use, but insisted that he has complied with all court orders and significantly reduced his alcohol use. Meanwhile, Father's mother, a teacher, several Cub Scout and Girl Scout leaders, and B.M. testified in support of Father. Father's witnesses reinforced the notion that Father was the better parent. Mother especially attacked B.M.'s credibility.

The trial court entered an order in October 2022, granting the parties' joint divorce request. The trial court's order does not include separate sections devoted specifically to findings of fact and conclusions of law. The trial court made no credibility determinations. The trial court offered an ambiguous statement in connection with Dr. Pate: "The children have been in counseling with a therapist who was hired as an expert by the father. The mother did not participate in the therapy as she felt the counselor was in the father's favor. As anticipated, the father's counselor testified against the mother generally and recommended an eighty percent (80%) to twenty percent (20%) split of custody in favor of the father." Otherwise, the trial court did not address Dr. Pate's testimony.

Concerning its decision on child custody, the trial court made only the following findings and conclusions of law:

> As to the first factor, the proof at trial demonstrated that the children love and care for both of their parents, and both parents are good parents who care and love their children. The mother has historically performed the majority of parenting responsibilities, but the father has also done an amazing job, considering his work hours. As to the second factor, both parents hold some animosity towards their spouse; however, under the circumstances, both seem willing and able to encourage a close relationship between their former spouse and children. Although the father has had some disappointing episodes with his step-children and the mother has not done all she could to cooperate with the father, the Court re-emphasizes this important part of co-parenting.

> As to the third factor, the Court heard no testimony in this regard. As to the fourth, fifth, and sixth factors, the Court has already found that both parents are capable of providing the necessities for their children and

continue to love their children as they always have. The testimony at trial revealed that the children are doing well under the circumstances, and the parents are to be commended. As to the eighth factor, the father appears to have a slight edge. Although the Court has some concerns about a few of the decisions and circumstances the mother has placed herself in, the Court believes that both parents have the ability to properly parent the children. As to the ninth factor, the children have siblings who frequent the mother's home, and the proof showed that both parents are involved in different activities with the kids. As to the tenth factor, the children spend time in both of their parents' homes and appear to be thriving. The Court considers both environments to be stable and satisfactory. As to the eleventh factor, the Court finds no physical or emotional abuse has occurred. As to the twelfth factor, the mother plans on re-attaining her teaching certificate, and this will help with the children's schedule. In addition, the father's remote work also contributes to the children's care when they are in his home.

Considering all of the above factors, the Court is modifying the Temporary Plan by adding a forty-eight (48)-hour period to the father's time on Wednesday afternoon from 3 p.m. until Friday afternoon at 3 p.m. on the alternating week. The parties shall have joint decision-making authority as to all matters except immediate needs while in their custody. The Court also finds that alternating the holidays and splitting non-school times equally is appropriate with each parent to receive at least one period of an uninterrupted two (2)-week vacation. The attorneys shall prepare a Parenting Plan that details the above findings.

Meanwhile, excluding its recitation of purely legal standards, the trial court provided only the following findings of fact and conclusions of law for its alimony decision:

As to the seventh factor, the proof adduced at trial shows that the mother has committed inappropriate marital conduct to include that she has had inappropriate relations with others during the parties' marriage. The Court finds that the divorce was caused by this conduct. . . . It was proven at trial that the mother needs to obtain her teaching certificate once again to permit her, as the economically disadvantaged spouse, to return to a standard of living comparable to the one she has enjoyed. To do this, the Court feels that One Thousand Five Hundred Dollars ($1,500.00) per month for three (3) years is the appropriate amount of rehabilitative alimony. The Court does not award any other alimony.

Finally, after dealing with some but not all issues related to property division and making a child support determination, the trial court stated, "[e]ach party shall receive Fifty

8

Percent (50%) of the other's pensions and retirement accounts on the date of this decision. These awards should be accomplished by the use of a QDRO[(qualified domestic relations order)] or other advantageous means." The trial court concluded by denying an award of attorney's fees in the case "[b]ased on the equities of the case, availability of money, and the fault of the divorce."

Both parties expressed dissatisfaction with the sufficiency of the trial court's order. The record reflects that Father filed a notice of appeal to this court. Mother, meanwhile, filed a motion to alter or amend "and for additional findings" asserting that the trial court failed to properly enter the parenting plan, did not indicate the date on which the obligations of the parenting plan were supposed to begin, did not indicate which parent should receive primary residential parent status, and failed to fully divide the parties' property. The trial court entered an order in response to Mother's motion to alter or amend. In it, the trial court set a retroactive start date of November 14, 2022. Additionally, the trial court named Mother primary residential parent under the plan. The trial court did not explain its reasoning for naming Mother primary residential parent. The trial court engaged in some further property distribution, but it indicated in its order that it believed that the parties would continue to work out the remaining property division issues and left those unresolved. The parties' efforts to privately resolve the additional property division issues failed, and the trial court ultimately entered a final order resolving the outstanding property-related issues on February 18, 2023.[5]

On appeal, Father raises objections concerning (1) the classification of the pre-marriage portion of his pension funds as marital property, (2) the award of rehabilitative alimony, and (3) the amount of parenting time allocated to each parent as well as Mother's designation as primary residential parent. Father also contends that the trial court's order does not include findings of fact and law sufficient to comply with the trial court's obligations under Tennessee Rule of Civil Procedure 52.01. Mother counters Father's contentions in her brief. She also raises three issues of her own including (1) whether the trial court should have awarded her alimony in futuro instead of rehabilitative alimony and, in any event, whether the amount of alimony awarded ought to be increased, (2) whether the trial court should have ordered Father to pay Mother's attorney's fees as a form of alimony in solido, and (3) whether this court should award her fees on appeal. Concerning

---

[5] We recognize that the trial court's October 17, 2022 order does not meet the requirements necessary to qualify as a final judgment and that finality was only achieved after Father filed his notice of appeal. *See, e.g., Tudors v. Bell*, No. 01-A-01-9802-CV00103, 1999 WL 187331, at *2 (Tenn. Ct. App. Apr. 7, 1999) ("A judgment is final, however, only when it adjudicates all the rights and liabilities of all the parties."). This is of no consequence to our jurisdiction to hear Father's appeal, however, as the Tennessee Rules of Appellate Procedure treat a prematurely filed notice of appeal "as filed after the entry of the judgment from which the appeal is taken and on the day thereof." Tenn. R. App. P. 4(d); *Meeks v. Successor Trustees of Marital Tr.*, No. W2009-02016-COA-R3-CV, 2010 WL 3420546, at *7 (Tenn. Ct. App. Sept. 1, 2010) (explaining the broad and unlimited nature of Rule 4(d)). Accordingly, we treat Father's notice of appeal as having been filed on February 18, 2023, as that is the date that the trial court finalized all issues related to the parties' divorce.

9

Father's pension argument, Mother also suggests that this court should deem the issue waived because Father did not include a property table in his brief, as is required by Tennessee Court of Appeals Rule 7.

II.

We turn first to considering Father's contention that the trial court erred as a matter of law by classifying pre-marriage pension funds as marital property. The trial court determined that "[e]ach party shall receive Fifty Percent (50%) of the other's pension and retirement accounts on the day of this decision. These awards should be accomplished by use of a QDRO or other advantageous means." Father contends the trial court erred by not first determining what portion of his pension was separate property, as opposed to marital property, before ordering the equal distribution of the pension. This matter presents a question of law, and our review thereof is de novo with no presumption of correctness. *See*, *e.g.*, *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013) (noting Tennessee appellate courts "review the trial court's resolution of questions of law de novo, with no presumption of correctness").

Tennessee domestic relations law distinguishes between separate property and marital property, making Tennessee a "dual property" state. *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 246 (Tenn. 2009) (citing to Tenn Code Ann. § 36-4-121 and *Eldridge v. Eldridge*, 137 S.W.3d 1, 12 (Tenn. Ct. App. 2002)). Tennessee Code Annotated section 36-4-121 allows for the division of only marital property upon the dissolution of a marriage. Tenn. Code Ann. § 36-4-121(a)(1) (effective July 1, 2017 to Mar. 30, 2022) ("In all actions for divorce or legal separation, the court having jurisdiction thereof may … equitably divide, distribute, or assign the *marital property* between the parties…."(emphasis added)). "'Separate property' is not part of the marital estate and therefore is not subject to division." *Snodgrass*, 295 S.W.3d at 246 (citing *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995)). It is therefore "imperative that the parties, the trial court, or both identify all of the assets possessed by the divorcing parties as either marital or separate so that a proper division can be accomplished." *Id.*

Tennessee Code Annotated section 36-4-121(b)(2)(B) specifically addresses pensions in defining marital property and separate property:

> (ii) "Marital property" includes the value of vested and unvested *pension benefits*, vested and unvested stock option rights, retirement, and other fringe benefit rights *accrued as a result of employment during the marriage*;

> (iii) The account balance, accrued benefit, or other value of vested and unvested *pension benefits*, vested and unvested stock option rights, retirement, and other fringe benefits *accrued as a result of employment prior*

10

*to the marriage, together with the appreciation of the value, shall be "separate property."* In determining appreciation for purposes of this subdivision (b)(2)(B)(iii), the court shall utilize any reasonable method of accounting to attribute postmarital appreciation to the value of the premarital benefits, even though contributions have been made to the account or accounts during the marriage, and even though the contributions have appreciated in value during the marriage; provided, however, *the contributions made during the marriage, if made as a result of employment during the marriage and the appreciation attributable to these contributions, would be "marital property."* When determining appreciation pursuant to this subdivision (b)(2)(B)(iii), the concepts of commingling and transmutation shall not apply;

Tenn. Code Ann. § 36-4-121(b)(2)(B)(ii), (iii) (emphasis added). Under these statutory provisions, the portion of a spouse's pension benefits accrued before marriage, along with the appreciation attributable to the pre-marital value, remain "separate property" not subject to distribution. *Id.*

Here, Father presented evidence at trial demonstrating that a portion of Father's pension was attributable to pre-marital employment. The trial court appears not to have taken into account that any portion of the pension qualified as separate property attributable to this pre-marriage employment before distributing the asset.

Mother does not dispute that the pension began accruing value pre-marriage, but she makes two arguments in support of the trial court's distribution, arguing it should not be disturbed. First, Mother argues that Father waived his argument regarding valuation and distribution of the pension by not providing this court with a property classification and division table pursuant to Tennessee Court of Appeals Rule 7.[6] Mother is correct that

---

[6] Rule 7 provides, in pertinent part, as follows:

**Rule 7. Briefs in Domestic Relations Cases.**

(a) In any domestic relations appeal in which either party takes issue with the classification of property or debt or with the manner in which the trial court divided or allocated the marital property or debt, the brief of the party raising the issue shall contain, in the statement of facts or in an appendix, a table in a form substantially similar to the form attached hereto. This table shall list all property and debts considered by the trial court, including: (1) all separate property, (2) all marital property, and (3) all separate and marital debts.

(b) Each entry in the table must include a citation to the record where each party's evidence regarding the classification or valuation of the property or debt can be found and a citation to the record where the trial court's decision regarding the classification, valuation, division, or allocation of the property or debt can be found.

11

non-compliance with Rule 7 may be grounds for waiver. *See e.g. Harden v. Harden*, M2009-01302-CA-R3-CV, 2010 WL 2612688, at *6-8 (Tenn Ct. App. June 30, 2010). However, this court exercises a preference to decide issues upon the merits and may in its discretion consider an issue despite a party's failure to include a Rule 7 table, especially where the table would be of little value to the determination of the issue and where the appealing party provides citation to the record supporting their argument elsewhere in their brief. *See e.g. Green v. Green*, No. M2011-00840-COA-R3-CV, 2012 WL 2389607, at *3 (Tenn. Ct. App. June 25, 2012) (exercising discretion to consider property division despite Rule 7 violation where the table would have been of little value given the trial court's failure to classify marital and separate property and where appellant provided relevant citations to the record elsewhere in their brief and also noting "our preference that cases be decided on the merits"); *Dilley v. Dilley*, M2009-02585-COA-R3-CV, 2011 WL 2015395, at *9 (Tenn. Ct. App. May 23, 2011) (exercising discretion to consider property division despite Rule 7 violation and despite voluminous record given "our preference that cases be decided on the merits"); *Wells v. Wells*, W2009-01600-COA-R3-CV, 2010 WL 891885, at *4 (Tenn. Ct. App. Mar. 15, 2010) (exercising discretion to "suspend the requirements" of Rule 7 even though the court consequently had to conduct a "tedious and meticulous review of the parties' briefs and the record" and noting "[t]he intent of the Rules is for all cases to be decided on the merits if possible"); *Collins v. Collins*, W2008-02660-COA-R3-CV, 2009 WL 3103821, at *4 (Tenn. Ct. App. Sept. 29, 2009) (same); *see also* Tenn. Ct. App. R. 1(b) ("For good cause, including the interest of expediting a decision upon any matter, this Court, or the panel assigned to hear a particular case, may suspend the requirements or provisions of any of these rules in a particular case on motion of a party, or on its own motion, and may order proceedings in accordance with its discretion.")

Here, in his brief before this court, Father has challenged the valuation and distribution of just one asset—the pension—and he has provided citation to the record supporting his contention that a portion of the pension is separate property. Thus, given the very narrow scope of the issue raised and the citation to the record in addressing this matter, and also mindful of the preference that cases be decided on the merits, we exercise our discretion to consider the issue despite Father's non-compliance with Rule 7. We caution, however, that our holding should not be construed as setting forth a general rule that a party may be routinely excused from the requirements of Rule 7. *See Green*, 2012 WL 2389607, at *3 & n. 4 (citing *Wells*, 2010 WL 891885, at *4).

Second, Mother argues in the alternative that even if the issue is not waived, the pension distribution should nonetheless not be disturbed because the evidence shows the pension was inextricably commingled with marital property. However, Tennessee Code

---

….

Tenn. Ct. App. R. 7.

12

Annotated section 36-4-121(b)(2)(B)(iii) specifically addresses and rejects commingling in relation to the portions of pension and other retirement accounts that constitute separate property. This statutory provision expressly states that "the concepts of commingling and transmutation shall not apply." Tenn. Code Ann. § 36-4-121(b)(2)(B)(iii). Nevertheless, in support of her contention that Father's argument fails because of comingling, Mother cites several cases that do not address pension or retirement accounts, but which instead address other types of accounts or property and which, accordingly, are not on point. *See e.g. Griffith-Ball v. Ball*, No. M2020-0059-COA-R3-CV, 2022 WL 1509675, at *2-3 (Tenn. Ct. App. May 13, 2022) (addressing comingling of account containing VA disability benefits); *Woodward v. Woodward*, 240 S.W.3d 825, 829 (Tenn. Ct. App. 2007) (addressing transmutation of real property). Mother also cites *Smith v. Smith*, 93 S.W.3d 871, 878 (Tenn. Ct. App. 2002), a case that addresses comingling in relation to IRA accounts. However, *Smith* was decided before Tennessee Code Annotated section 36-4-121 was amended[7] to provide that "the concepts of commingling and transmutation shall not apply" when determining separate and marital property portions of pensions and other retirement benefits, and thus the case cannot support Mother's contention.

Accordingly, Mother's argument is unavailing. We are left with undisputed evidence that Father's pension has a pre-marital component making it, in part, separate property. The trial court, however, treated the entirety of the pension as marital property; accordingly, the trial court made no determination of what portion of the pension is separate property before distributing the asset as part of the marital estate. Because separate property is not part of the marital estate and thus may not be distributed in divorce proceedings, the trial court's distribution of the separate property portion of the pension as part of the marital estate is in error. *See Dover v. Dover*, No. E2019-01891-COA-R3-CV, 2020 WL 7224368, at *12 (Tenn. Ct. App. Oct. 13, 2020) ("In light of the undisputed evidence that Father's 401(k) has a premarital component that remained his separate asset, the trial court's decision to classify the entire 401(k) as a martial asset is an error of law that warrants reversal."); *Eldridge v. Eldridge*, 137 S.W.3d 1, 12 (Tenn. Ct. App. 2002) (noting that a trial court's classification of assets may be reversed when based on an error of law).

In terms of addressing this error, Father notes that he has "no issue with dividing the marital portion of the pension in half," but asks this Court to amend the award and remand for entry of judgment, suggesting we direct the trial court to use a "deferred distribution method of dividing uncertain retirement benefits," which, he contends, would result in an award of 36.8% of the pension benefits to Mother. However, Tennessee Code Annotated section 36-4-121 directs that "[i]n determining appreciation for purposes of this subdivision (b)(2)(B)(iii), the court shall utilize any reasonable method of accounting to attribute postmarital appreciation to the value of the premarital benefits, even though contributions

---

[7] Amended by 2015 Tenn. Pub. Acts, ch. 202, § 1.

have been made to the account or accounts during the marriage, and even though the contributions have appreciated in value during the marriage." Tenn. Code Ann. § 36-4-121(b)(2)(B)(iii). We conclude that it is appropriate for the trial court to make the determination of the best approach in the first instance.[8] Accordingly, we vacate the portion of the trial Court's March 7 Order directing the Father's pension be split 50/50 and remand for classification of the separate and martial portions of the pension and distribution of the marital portion consistent with Tennessee Code Annotated section 36-4-121.

III.

Turning to the alimony award, as to which both parties object, the trial court awarded Mother rehabilitative alimony in the amount of one thousand five hundred dollars ($1,500.00) per month for three years. No other alimony was awarded.

Father argues that any award of alimony is an error because Mother did not put on any proof of need in the present case. In the alternative, Father argues that even if Mother did demonstrate need, rehabilitative alimony was inappropriate because Mother was not in need of rehabilitation. In contrast, Mother argues that the alimony award is too low to meet her demonstrated need, which she indicates she did establish, and that the alimony award should be increased to at least $5,000 per month for at least four years. She also argues she should be awarded alimony in futuro instead of rehabilitative alimony. Mother also asserts that she should have been awarded attorney's fees as a form of alimony in solido.

We vacate the trial court's decisions as to alimony and remand for further proceedings for two reasons. First, our holding above vacating the distribution of the father's pension warrants vacating the alimony award. Second, the factual findings made by the trial court are insufficient such that we are unable to determine from the trial court's order the basis for awarding alimony of the stated kind and amount.

First, "the division of marital property and each party's separate assets impact the question of alimony." *Griffith-Ball*, 2022 WL 1509675, at *2 (citing to Tenn. Code. Ann. § 36-5-121(i)(7)-(8) (effective April 25, 2011 to Mar. 30, 2022)). Under Tennessee Code Annotated section 36-5-121, two of the twelve factors that the court "shall consider" in

---

[8] The trial court is free to take additional proof, including expert proof, to resolve this issue. *See Dover*, 2020 WL 7224368, at *7, n.12 (remanding for determination of the premarital value of 401(k) as well as the appreciation attributable to the premarital and postmarital contributions and noting "[i]n its discretion, the trial court is free to take additional proof, including expert proof, to resolve this issue"); *Erdman v. Erdman*, No. M2018-01668-COA-R3-CV, 2019 WL 6716305, at *4 (Tenn. Ct. App. Dec. 10, 2019) (remanding for determination of separate property portion of retirement accounts and noting that "[t]he trial court, in its discretion, is free to take additional proof, including expert proof, to resolve this issue.")

granting alimony are "[t]he separate assets of each party" and "[t]he provisions made with regard to the marital property." Tenn Code Ann. § 36-5-121(i)(7),(8). Accordingly, when an appellate court vacates a marital property division and remands for reconsideration, this often necessitates also vacating any alimony award and remanding for reconsideration in light of the new division of property. *See e.g. Griffith-Ball*, 2022 WL 1509675, at *6 ("[W]e remand for a reconsideration of the property division. The trial court should also consider whether its new property division impacts its awards of alimony. So we vacate the alimony awards and remand for a determination of whether alimony is appropriate, and, if so, the type, amount, and duration of alimony."); *Green*, 2012 WL 2389607, at *4 (affirming the trial court's determination that an award of alimony was appropriate where the trial court's findings regarding the Mother's need and Father's ability to pay had "not been challenged by either party," but nonetheless vacating the alimony award and remanding for further consideration in part because the division of marital property was also vacated and remanded); *Trezevant v. Trezevant*, 568 S.W.3d 595, 624 (Tenn. Ct. App 2018) (explaining that "any issues on appeal related to alimony are pretermitted by our holding that the valuation of the marital estate should be vacated" because "the trial court may award spousal support only after the court has equitably divided the parties' marital property" and ordering the award of alimony "vacated and remanded for reconsideration in light of a proper valuation and distribution of the marital estate"). Here, how the pension is ultimately divided will affect both the separate assets of the Father and the division of marital property, two of the factors the trial court "shall consider" in granting alimony. Tenn. Code Ann. § 36-5-121(i)(7),(8).

Furthermore, independent of our holding regarding the division of the pension, we must vacate and remand the alimony award due to insufficient findings. The trial court's order addressing alimony includes a brief discussion of Tennessee law regarding alimony. The trial court properly noted that our case law indicates that the two most important factors to consider are the disadvantaged spouse's need and the obligor spouse's ability to pay. The trial court also briefly discussed the purpose of rehabilitative alimony as intended to assist the financially disadvantaged spouse in becoming self-sufficient and achieving an earning capacity reasonably comparable to the pre-divorce standard of living or the post-divorce standard of living expected to be available to the other spouse.

Aside from its general statements regarding Tennessee law related to alimony determinations, the trial court made only two factual findings when expressly addressing its alimony award. One, referring to the relative fault of the parties, the eleventh factor listed in Tennessee Code Annotated section 36-5-121(i), which the trial court described as the seventh factor or ninth factor, the trial court stated: "the proof adduced at trial shows that the mother has committed inappropriate marital conduct to include that she has had inappropriate relations with others during the parties' marriage. The Court finds that the divorce was caused by this conduct." Two, after discussing the purpose of rehabilitative alimony, the trial court stated: "It was proven at trial that the mother needs to obtain her teaching certificate once again to permit her, as the economically disadvantaged spouse, to

return to the standard of living comparable to the one she has enjoyed. To do this, the Court feels that One Thousand Five Hundred Dollars ($1,500.00) per month for (3) years is the appropriate amount of rehabilitative alimony. The Court does not award any other alimony."

In relation to required findings, Tennessee Rule of Civil Procedure 52.01 states:

In all actions tried upon the facts without a jury, *the court shall find the facts specially* and shall state separately its conclusions of law and direct the entry of the appropriate judgment. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rules 41.02 and 65.04(6).

Tenn. R. Civ. P. 52.01 (emphasis added).

The Tennessee Supreme Court has explained that, in addition to "decreas[ing] the likelihood of an appeal" in any given case, abiding by the requirements of Rule 52.01 "facilitate[s] appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision." *Lovlace v. Copley*, 418 S.W.3d 1, 34-35 (Tenn. 2013). Accordingly, "the current version of Rule 52.01 requires the court to make these findings of fact regardless of a request by either party." *Manning v. Manning*, 474 S.W.3d 252, 260 (Tenn. Ct. App. 2015); *see also Hanson v. J.C. Hobbs Co.*, No. W2011-02523-COA-R3-CV, 2012 WL 5873582, at *9 (Tenn. Ct. App. Nov. 21, 2012) (discussing the impact of amending Rule 52.01). In the present case, the parties expressed dissatisfaction with the trial court's findings, but the trial court did not respond by further detailing the basis of its ruling.

While "[t]here is no bright-line test by which to assess the sufficiency of factual findings, . . . 'the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue.'" *Lovlace*, 418 S.W.3d at 35 (quoting 9C *Federal Practice and Procedure* § 2579, at 328). In rendering its findings of fact and conclusions of law, the trial court "has a duty to ensure that its rulings are adequately explained," *Vaughn v. DMC-Memphis, LLC*, No. W2019-00886-COA-R3-CV, 2021 WL 274761, at *11 (Tenn. Ct. App. Jan. 27, 2021), so as to avoid creating a circumstance in which an appellate court is "left to guess as to why the trial court reached its conclusion," *Calzada v. State Volunteer Mut. Ins. Co.*, No. M2020-01697-COA-R3-CV, 2021 WL 5368020, at *8 (Tenn. Ct. App. Nov. 18, 2021); *see also Etheredge v. Est. of Etheredge*, No. M2022-00451-COA-R3-CV, 2023 WL 5367681, at *6 (Tenn. Ct. App. Aug. 22, 2023).

16

Where findings are insufficient under Rule 52.01, generally there are two available remedies for an appellate court. "One remedy appellate courts typically apply when a trial court's findings fail to satisfy the Rule 52.01 requirement is to remand the case to the trial court with directions to issue sufficient findings and conclusions. Alternatively, an appellate court may choose to remedy the trial court's deficient factual findings by conducting a de novo review of the record to determine where the preponderance of the evidence lies." *Lovlace*, 418 S.W.3d at 36 (citations omitted); *see also Gooding v. Gooding*, 477 S.W.3d 774, 783 (Tenn. Ct. App. 2015) (explaining de novo review option); *Hall v. Humphrey*, 673 S.W.3d 613, 627 (Tenn. Ct. App. 2023) (explaining vacatur option). This second option is often referred to as "soldiering on." *Manning*, 474 S.W.3d at 260 (calling the second option the "soldier on" path).

Soldiering on is appropriate, for example, when the trial court's decision is "readily ascertainable" or "involves only a clear legal issue." *Hardin v. Hardin*, No. W2012-00273-COA-R3-CV, 2012 WL 6727533, at *5 (Tenn. Ct. App. Dec. 27, 2012); *Hanson*, 2012 WL 5873582, at *10; *Town of Middleton v. City of Bolivar*, No. W2011-01592-COA-R3-CV, 2012 WL 2865960, at *26 (Tenn. Ct. App. July 13, 2012); *Clarke v. City of Memphis*, 473 S.W.3d 285, 291 (Tenn. Ct. App. 2015); *In re Estate of Dell'Aquila*, No. M2018-01090-COA-R3-CV, 2019 WL 337037, at *3 (Tenn. Ct. App. Jan. 25, 2019). Soldiering on can promote important policy goals of the judiciary, such as protecting "judicial economy" and providing "finality" to the parties involved in what can sometimes become protracted litigation. *See, e.g., In re Houston D.*, 660 S.W.3d 704, 721-22 (Tenn. Ct. App. 2022) (collecting cases); *In re S.J.*, 387 S.W.3d 576, 594 n.9 (Tenn. Ct. App. 2012) (referencing potential Rule 52.01 violation but choosing to soldier on "so as to not delay resolution of the status of these children"); *cf. Long v. Long*, 642 S.W.3d 803, 816-817 (Tenn. Ct. App. 2021) (analyzing soldiering on option in the context of a Rule 56.04 violation).

However, complications can obscure the path ahead when considering soldering on and can render vacatur the more appropriate course to follow. Vacatur is often the preferred option when the issues presented on appeal are fact-intensive and turn on disputed factual predicates. *See, e.g., Cox v. Cox*, No. E2016-01097-COA-R3-CV, 2017 WL 6517596, at *6 (Tenn. Ct. App. Dec. 20, 2017) (concerning equitable division of marital property); *Grubb v. Grubb*, No. E2016-01851-COA-R3-CV, 2017 WL 2492085, at *13 (Tenn. Ct. App. June 9, 2017) ("The parties raise a host of issues, including those issues pertaining to classification of separate and marital property, the division of the marital estate, child support, and school tuition. Attempting to resolve these fact-oriented issues without detailed factual findings by the Trial Court would be akin to conducting a fresh trial, which is not our role."). Vacatur also has been employed where the outcome may hinge on the credibility of witnesses but the trial court failed to make helpful credibility findings. *Cox* 2017 WL 6517596, at *6 ("The issues raised on appeal involve credibility determinations and a careful balancing of the equities between the parties, not clear legal issues."); *Roseborough v. Caldwell*, No. W2018-01168-COA-R3-CV, 2019 WL 6898218, at *4 (Tenn. Ct. App. Dec. 18, 2019) ("Despite the parties presenting contradictory testimony,

the Trial Court did not make credibility determinations or specific findings of fact as to many of those factual issues . . . Many of the statements . . . were conclusory statements regarding the evidence presented and not specific findings of fact as required."); *Manning*, 474 S.W.3d at 262 (justifying vacatur in part on the fact that the "trial court made no specific credibility findings with regard to the parties"); *cf. Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 313-14 (Tenn. 2017) (remanding in a remittitur case instead of soldiering on "[w]here credibility is a significant issue," because the appellate court is left "without some idea of whether or in what regard the trial court's assessment of the witnesses' credibility differed from that of the jury," rendering the appellate court "unable to review the evidence to determine whether it preponderates against the suggested remittitur").

Here, the trial court's findings of fact relating to its alimony decision do not meet the requirement in Rule 52.01 that "the court shall find the facts specially" and consequently, we simply cannot determine the steps by which the court arrived at its ultimate alimony award. As the trial court correctly noted, the most important factors to consider in an alimony award are need and ability to pay, but the trial court did not make any factual findings on these two crucial factors. Assuming that the trial court considered the relevant applicable statutory factors, it is still not apparent what the trial court's assessment was of these factors.

Having found that the trial court's order does not meet the requirements of Rule 52.01, we are left with the choice of whether to "soldier on" by conducting a de novo review of the record, affording no deference to the trial court's findings, or whether to vacate and remand for the trial court to make the necessary factual determinations in the first instance. We conclude the latter course is more appropriate in this case. The basis for the trial court's decision is not "readily ascertainable" from a record review, and the matter in contention does not involve only "a clear legal issue," but rather turns on voluminous, detailed, and often contradictory testimony that will necessarily involve credibility determinations. *Hardin*, 2012 WL 6727533, at *5. An appellate court is simply not in a position to undertake such factual findings in the first instance.

Given the nature of the trial court's findings, we are unable to effectively address Father's and Mother's competing objections to the trial court's ruling as to alimony. Therefore, for the reasons discussed, we vacate the trial court's award of alimony and remand for further consideration and findings in light of the factors set forth in Tennessee Code Annotated section 36-5-121.

## IV.

Finally, we turn to the Parenting Plan. While awaiting trial, the parties followed an agreed-upon temporary parenting plan in which "the father has the children every other

Thursday from 3 p.m. until Monday at 3 p.m., with the mother having the children for the majority of the remainder of the month." In its October 7 Opinion and Order, the trial court modified the temporary parenting plan "by adding a forty-eight (48)-hour period to the father's time on Wednesday afternoon from 3 p.m. until Friday afternoon at 3 p.m. on the alternative week." The trial court further ordered that "[t]he parties shall have joint decision-making authority as to all matters except immediate needs while in their custody." The trial court also found "that alternating holidays and splitting non-school times equally is appropriate with each parent to receive at least one period of an uninterrupted two (2)-week vacation." Upon the Mother's motion to alter or amend, the trial court amended its original order to reflect that Mother is deemed the primary residential parent, and also to reflect that "each parent would receive at least one period of a two-week vacation to take place during the children's summer break."

Father contends on appeal that the trial court erred in issuing a parenting plan that provided Father less parenting time than Mother and designated Mother as the primary residential parent. Father also contends that the trial court failed to make adequate findings of fact pursuant to Tennessee Rule of Civil Procedure 52.01 and asks this court to soldier on to engage in a de novo review of the record. Mother counters that the trial court made appropriate findings of fact and that Father's contention to the contrary is frivolous. We agree that the findings of fact are insufficient. However, we decline Father's invitation to review the record de novo, and we instead remand for the trial court to undertake this fact- and credibility-intensive inquiry in the first instance.

As detailed above, Rule 52.01 requires that "[i]n all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." Tenn. R. Civ. P. 52.01. "The importance of Rule 52.01 findings of fact and conclusions of law cannot be underscored enough, particularly in a fact-intensive matter such as a case in which the parenting arrangement is at issue." *In re Noah J.*, No. W2014-01778-COA-R3-JV, 2015 WL 1332665, at *5 (Tenn. Ct. App. Mar. 23, 2015) (quoting *Williams v. Singler*, No. W2012-01253-COA-R3-JV, 2013 WL 3927934, at *9 (Tenn. Ct. App. July 31, 2013). "Under Rule 52.01, a trial court's order should indicate why and how it reached a decision and which factual findings led the court to rule as it did." *Id.* (citing *Pandey v. Shrivastava*, No. W2012-00059-COA-R3-CV, 2013 WL 657799, at *4 (Tenn. Ct. App. Feb. 22, 2013)). "Without such findings and conclusions, this court is left to wonder on what basis the [trial] court reached its ultimate decision." *Id.* (quoting *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *19 (Tenn. Ct. App. Apr. 21, 2004)).

In child visitation and custody determinations, the "polestar, the *alpha and omega*" is the best interest of the child. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001) (quoting *Bah v. Bah*, 668 S.W.2d 663, 665 (Tenn. Ct. App. 1983)); Tenn. Code Ann. § 36-6-401 ("In any proceeding between parents under this chapter, the best interests of the child shall be the standard by which the court determines and allocates the parties' parental

19

responsibilities."); *In re Briley R.*, 2017 WL 5054304, at *4 ("While a trial court has broad discretion in fashioning the details of a parenting plan, the touchstone is the best interest of the child."). When determining which parent should have primary residential custody, the trial court must "conduct a 'comparative fitness' analysis, requiring the court to determine which of the available parents would be comparatively more fit than the other." *Grissom v. Grissom*, 586 S.W.3d 387, 392 (Tenn. Ct. App. 2019) (citing *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006); *Bah*, 668 S.W.2d at 666). In engaging in this analysis, the court must consider the relevant applicable factors set out in Tennessee Code Annotated § 36-6-106(a):

The court shall consider all relevant factors, including the following, where applicable:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a)(1)-(15) (effective July 1, 2016, to Jun. 30, 2021); *see also Grissom*, 586 S.W.2d at 392. Additionally, "while there is no mandate that a trial court make credibility findings during a custody dispute, it is well-settled that such findings are often essential to our review of custody matters." *Grissom*, 586 S.W. 2d at 396.

In its October 7 Order, the trial court made the following findings of fact related to the Parenting Plan and the best interest factors:

21

The parties also pointed out that they had previously entered into an Agreed Temporary Parenting Plan. . . . It was also agreed that the temporary schedule would not set precedent. The proof showed at trial that since the Temporary Plan was enacted, the parties have generally followed the plan. The father has the children every other Thursday from 3 p.m. until Monday at 3 p.m., with the with the mother having the children for the majority of the remainder of the month. The father works hard at his job and works long hours occasionally; however, he is able to work remotely the majority of the time. The children have been in counseling with a therapist who was hired as a expert by the father. The mother did not participate in the therapy as she felt the counselor was in the father's favor. As anticipated, the father's counselor testified against the mother generally and recommended an eighty percent (80%) to twenty percent (20%) split of custody in the favor of the father.

. . . .

As to the first factor, the proof at trial demonstrated that the children love and care for both of their parents, and both parents are good parents who care and love their children. The mother has historically performed the majority of parenting responsibilities, but the father has also done an amazing job, considering his work hours. As to the second factor, both parents hold some animosity towards their spouse; however, under the circumstances, both seem willing and able to encourage a close relationship between their former spouse and children. Although the father has had some disappointing episodes with his step-children and the mother has not done all she could to cooperate with the father, the Court re-emphasizes this important part of co-parenting.

As to the third factor, the Court heard no testimony in this regard. As to the fourth, fifth, and sixth factors, the Court has already found that both parents are capable of providing the necessities for their children and continue to love their children as they always have. The testimony at trial revealed that the children are doing well under the circumstances, and the parents are to be commended. As to the eighth factor, the father appears to have a slight edge. Although the Court has concerns about a few of the decisions and circumstances the mother has placed herself in, the Court believes that both parents have the ability to properly parent the children. As to the ninth factor, the children have siblings who frequent their mother's home, and the proof showed that both parents are involved in different activities with the kids. As to the tenth factor, the children spend time in both of their parents' homes and appear to be thriving. The court considers both environments to be stable

and satisfactory. As to the eleventh factor, the Court finds no physical or emotional abuse has occurred. As to the twelfth factor, the mother plans on re-attaining her teaching certificate, and this will help with the children's schedule. In addition, the father's remote work also contributes to the children's care when they are in his home.

Although the trial court refers to the twelfth factor, it appears the trial court's discussion relates to the fourteenth factor in the statute. The seventh, twelfth, and thirteenth factors do not appear to be addressed specifically, and in light of the testimony, it is not clear why at least the seventh and twelfth factors are not relevant and applicable in the present case.

In addition, two significant matters were notably missing from the trial court's October 7 Order. One, the trial court nowhere employed the term best interest or referred to how the facts found connected with a parenting plan that was in the children's best interest. Two, the trial court's October 7 Order also did not designate a primary residential parent, nor is it obvious from the findings therein who should be the primary residential parent and why. In response to a motion to alter or amend its order, the trial court did name Mother the primary residential parent. The trial court did so, however, without any additional findings of fact or explanation of how the previously found facts related to the trial court's decision to award primary parenting status to Mother. Again, in this later ruling, the trial court did not employ the language of the best interest of the children. Nowhere did the trial court actually state that the plan was in the best interest of the children.

In this case, while the trial court briefly discussed most of the best interest factors, many of the factual findings are in the form of broad generalities and do not specifically reference the sharply and hotly contested issues that were presented at trial. *See Williams v. Singler*, 2013 WL 3927934, at *9 (holding non-compliance with Rule 52.01 where "trial court made only broad generalized statements" rather than specific factual findings).[9] For instance, both parents accused the other of alcohol problems, but these accusations are not

---

[9] In *Williams v. Singler*, this Court explained:

> At the outset, we must observe that the trial court below made few factual findings regarding the underlying facts in this case. For example, as to the primary factual dispute on Father's alternate parenting time, the trial court made only broad generalized statements such as: "The mother has repeatedly and consistently violated the terms of the Parenting Plan in denying the father's shared parenting right at essentially any time that litigation wasn't pending." However, the parenting time at issue for Father in the hearing below took place over a period of a few weeks, and the trial court made no factual findings as to particular occasions on which Father was denied his scheduled parenting time and why the denial occurred.

*Williams*, 2013 WL 3927934, at *9.

referenced in regard to any of the factors they may affect, and no credibility determinations regarding these accusations were made. The expert testimony from the only psychologist who treated the children suggested an 80/20 percent split in favor of Father, but there is no explanation as to why the court disregarded this testimony.

Significantly, as noted above, there is never an explicit finding that the arrangement is in the best interest of the child, and the discussion of the factors is not such that it is readily apparent why one parent would have more time than the other. The trial court fails to identify how the factors are weighed in relation to one another to arrive at the decision that the plan is in the best interests of the children. Furthermore, as noted above, the trial court does not actually state that the determination it is reaching is in the best interest of the children.

Problematically, there is no explanation as to why Mother is named the primary residential parent. Indeed, in the original October 7 order, the trial court made no determination as to which parent should serve as the primary residential parent. In addressing a motion to alter or amend, the trial court named Mother as the primary residential parent. In doing so, the trial court made no additional findings of fact and offered no explanation as to how the previously found facts led the court to that conclusion. The court did not engage in an analysis that explains its decision regarding the primary residential parent.

Simply put, the findings are not specific enough that we can determine "why and how it reached a decision." *In re Briley R.*, 2017 WL 5054304, at *5. Rather, we are "left to wonder at the trial court's reasoning." *Id.* Given the nature of the record in the present case and that findings of fact are "particularly important" and "often hinge on subtle factors" in child custody and parenting schedule cases, such as the one hand, *id.*, we decline to exercise our discretion to soldier on with a de novo review of the record. Accordingly, we vacate the parenting plan and designation of mother as primary residential parent and remand with instructions to make detailed findings of fact and conclusions of law related to these determinations.

"We recognize that time has marched on during this litigation." *See Owens v. May*, No. E2020-01322-COA-R3-JV, 2021 WL 3671097, at *3 (Tenn. Ct. App. Aug. 19, 2021); *see also In re Carter K.*, No. M2017-01507-COA-R3-JV, 2018 WL 896060, at *6 (Tenn. Ct. App. Feb. 14, 2018) ("We recognize, however, that lives and events have not stood still while this custody dispute has been in the courts"). We also recognize that Judge Johnson, who sat by special designation in this case after retiring from the bench, will likely not be involved in deciding these issues on remand. Accordingly, the trial court should certainly consider hearing additional evidence on these issues to make the most accurate assessment of the parties' current situations. *See id.*; *see also* Tenn. R. Civ. P. 63 (outlining standards for rehearing proof in the event a case is taken over by a successor judge).

24

V.

Mother also seeks attorney's fees on appeal. Though not cited in her brief, Mother appears to be relying upon Tennessee Code Annotated section 36-5-103(c) as the basis for an award of attorney's fees on appeal in the present case. This statutory measure provides as follows:

> (c) A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the nonprevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

Tenn. Code Ann. § 36-5-103(c). Where the matter falls within the ambit of the statute,[10] it is a matter of discretion for this court whether to award attorney's fees, and this court considers "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that should be considered." *Ellis v. Ellis*, 621 S.W.3d 700, 709 (Tenn. Ct. App. 2019). It is not apparent that Mother qualifies as the prevailing party on appeal in this case, and we decline under the circumstances of the present case to award attorney's fees in relation to this appeal.[11]

VI.

For the aforementioned reasons, we reverse in part and vacate in part the judgment of the General Sessions Court for Warren County. Costs of this appeal are taxed equally between the appellant, Daniel Michael Bailey, and the appellee, Heather Marie Bailey, for which execution may issue if necessary. The current parenting plan will remain in effect until the trial court enters a new temporary or permanent parenting plan. The case

---

[10] "It is a general rule in this State that litigants must pay their own attorney fees." *Fossett v. Gray*, 173 S.W.3d 742, 752 (Tenn. Ct. App. 2004). As a general proposition, "absent a contractual agreement or statutory provision to the contrary, the 'American Rule' requires litigants to pay their own attorney's fees and costs." *Highlands Physicians, Inc. v. Wellmont Health Sys.*, 625 S.W.3d 262, 307 (Tenn. Ct. App. 2020). Where "[n]one of the triggering events for attorney's fees mentioned in Tennessee Code Annotated section 36-5-103(c) apply," "the ultimate statutory basis for the authority pursuant to which . . . attorney's fees on appeal [are sought under the statutory provision] is simply inapplicable . . . ." *Henry v. Henry*, No. M2024-00030-COA-R3-CV, 2025 WL 304573, at *13 (Tenn. Ct. App. Jan. 27, 2025).

[11] Our determination is based upon considerations related to this appeal and is not addressed to the merits of the trial court awarding attorney's fees as a form of alimony in connection with any proceedings before it.

is remanded for further proceedings consistent with this opinion.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE